## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of May __, 2024 (the "Effective Date"), by and between L4 Bio LLC (the "Buyer"), and Gregory M. Messer, solely in his capacity as Chapter 7 Trustee (the "Trustee") of the estate (the "Estate") of Equilibre Biopharmaceuticals Corp. (the "Seller"). Capitalized terms used herein and not otherwise defined herein have the meaning set forth in Article I.

## RECITALS

WHEREAS, on December 29, 2023 (the "Petition Date"), Equilibre Biopharmaceuticals Corp. (the "Debtor") filed a voluntary petition under chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and the Debtor's case is being administered under Case No. 23-12099 (PB) (the "Bankruptcy Case"); and

WHEREAS, on or around the Petition Date, Gregory M. Messer was appointed interim trustee of the Debtor's bankruptcy estate (the "Estate"), and he subsequently qualified and is currently serving as permanent trustee of the Debtor's Estate; and

WHEREAS, prior to the Petition Date, the Debtor was developing a novel and differentiated therapeutic candidate for adjunctive therapy for focal seizures in adults with epilepsy; and

WHEREAS, Buyer was a principal of the Debtor and wishes to obtain the Acquired Assets (defined below); and

WHEREAS, Buyer has delivered to the Trustee an amount of cash totaling $65,000.00 representing the cash component of the Purchase Price (as defined below) and the deposit (the "Deposit"); and

WHEREAS, Trustee believes, following consultation with his professionals, and consideration of available alternatives, that, in light of the current circumstances, a sale of the Estate's intellectual property assets as provided herein is necessary to maximize value, and is in the best interest of the Debtor's Estate and its creditors; and

WHEREAS, Trustee desires to sell to Buyer all of the Acquired Assets (defined below), and Buyer desires to purchase from Trustee, on the terms and subject to the conditions hereinafter set forth; and

WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order under, *inter alia*, section 363 of the Bankruptcy Code; and

WHEREAS, the Parties desire to consummate the proposed transaction as promptly as practicable after the Bankruptcy Court enters the Sale Order.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.   For purposes of this Agreement, the following terms have the meaning specified or referenced below.

"Acquired Assets" shall have the meaning set forth in Section 2.1.

"Affiliate" shall have the meaning ascribed to it section 101(2) of the Bankruptcy Code.

"Agreement" shall have the meaning set forth in the Preamble.

"Alternative Transaction" means a transaction or series of related transactions (whether by asset sale, equity purchase, merger or otherwise) pursuant to which Trustee agrees to a sale (to a Person other than Buyer) of all of the Acquired Assets or any group of assets that includes all or any material portion of the Acquired Assets.

"Assumed Liabilities" shall have the meaning set forth in Section 2.1.

"Auction" shall mean the auction of the Acquired Assets.

"Avoidance Actions" means any and all claims for relief of Trustee under chapter 5 of the Bankruptcy Code, or state fraudulent conveyance, fraudulent transfer or other similar state laws.

"Bankruptcy Case" shall have the meaning set forth in the Recitals.

"Bankruptcy Code" means Title 11 of the United States Code, section 101 *et seq.*

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Business Day" means any day of the year, other than a Saturday or Sunday, on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized by Law to close.

"Buyer" shall have the meaning set forth in the Preamble.

"Cash Consideration" means the $65,000.00 Deposit.

"Claims" means all claims, causes of action, rights of recovery and rights of set-off of Trustee, in each case, of whatever kind or description against any Third Party.

"Closing" shall have the meaning set forth in Section 3.4.

"Closing Date" shall have the meaning set forth in Section 3.4.

"Closing Legal Impediment" shall have the meaning set forth in Section 8.2.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Bids" shall have the meaning set forth in Section 6.2(a).

# EXHIBIT A TO SALE MOTION - ASSET PURCHASE AGREEMENT

"Contract" means any contract, agreement, undertaking, license, sublicense, sales order, purchase order or other commitment, whether written or oral (including commitments to enter into any of such), that is binding on any Person or any part of its property under applicable Law.

"Debtor" shall have the meaning set forth in the Recitals.

"Deposit" shall have the meaning set forth in the Recitals.

"Effective Date" shall have the meaning set forth in the Preamble.

"Encumbrance" means any charge, lien, claim, mortgage, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

"Estate" shall have the meaning set forth in the Preamble.

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"Excluded Liabilities" shall have the meaning set forth in Section 2.4.

"Governmental Authority" means any United States federal, state, municipal or local or any foreign government, governmental agency or authority, or regulatory or administrative authority, including the United States Patent and Trademark Office and United States Copyright Office, or any court, tribunal or judicial body having competent jurisdiction, including the Bankruptcy Court.

"Law" means any foreign or domestic law, statute, code, ordinance, rule, regulation, order, judgment, writ, stipulation, award, injunction or decree by any Governmental Authority.

"Liability" means any debt, loss, claim, damage, demand, fine, judgment, penalty, liability or obligation (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"Material Adverse Effect" means any effect, change, condition, circumstance, development or event that, individually or in the aggregate with all other effects, changes, conditions, circumstances, developments and events has had, or would reasonably be expected to have, a material adverse effect on (x) the Acquired Assets, or (y) Seller's ability to consummate the transactions contemplated hereby.

"Order" means any award, writ, injunction, judgment, order or decree entered, issued, made or rendered by any Governmental Authority.

"Outside Date" shall have the meaning set forth in **Error! Reference source not found.**.

"Party" or "Parties" means, individually or collectively, Buyer and Seller.

"Permitted Encumbrances" means the list of encumbrances set forth on Schedule 1.1.

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"Petition Date" shall have the meaning set forth in the Recitals.

"Post-Closing Tax Period" means (a) any taxable period beginning after the Closing Date and (b) the portion of any Straddle Period beginning after the Closing Date.

"Pre-Closing Covenant" shall have the meaning set forth in Section 11.13.

"Pre-Closing Tax Period" means (a) any taxable period ending on or before the Closing Date and (b) the portion of any Straddle Period beginning on the first day of such Straddle Period and ending at the close of business on the Closing Date.

"Proceeding" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority, other than an Avoidance Action.

"Purchase Price" has the meaning set forth in Section 3.1.

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Sale Motion" shall mean the motion filed by the Trustee seeking approval of the sale of the Acquired Assets.

"Sale Notice" means the official notice of the sale hearing and opportunity to submit a higher or better offer or object filed by the Trustee and served upon the Debtor's creditors and parties in interest pursuant to Fed. R. Bankr. P. 2002.

"Sale Order" means an Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby.

"Seller" shall have the same meaning as Trustee as defined in the Preamble.

"Seller Termination Notice" shall have the meaning set forth in Section 10.1(d)(i).

"Straddle Period" means any taxable period beginning on or before the Closing Date and ending after the Closing Date.

"Subsidiary" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body.

"Successful Bidder" means the Person submitting the bid determined to be the highest or best offer for the Acquired Assets.

"Tax" or "Taxes" means any federal, state, local or foreign income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, alternative minimum, estimated or other tax or imposition, including any interest, penalty or addition thereto.

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed with or required to be filed with any Governmental Authority or required to be provided to any Person,

in each case in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Third Party" means a Person who or which is neither a Party nor an Affiliate of a Party.

"Transaction Documents" means this Agreement, and any other agreements, instruments or documents entered into pursuant to this Agreement.

"Transfer Taxes" shall have the meaning set forth in Section 7.1(a).

"Trustee" shall have the meaning set forth in the Preamble and shall be interchangeable with "Seller".

Section 1.2    Other Definitions and Interpretive Matters.

(a)    Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

(i)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    Any reference in this Agreement to "$" means U.S. dollars.

(iii)    Unless the context otherwise requires, all capitalized terms used in the Schedules shall have the respective meanings assigned in this Agreement. No reference to or disclosure of any item or other matter in the Schedules shall be construed as an admission or indication that such item or other matter is material. No disclosure in the Schedules relating to any possible breach or violation of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred. Any information, item or other disclosure set forth in any Schedule shall be deemed to have been set forth in all other applicable Schedules if the relevance of such disclosure to such other Schedule is reasonably apparent on its face. All Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(iv)    Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(v)    The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "Section," "Article," or "Schedule" are to the corresponding Section, Article, or Schedule of or to this Agreement unless otherwise specified.

(vi)    Words such as "herein," "hereof" and "hereunder" refer to this Agreement as whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(vii)    The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)     No Strict Construction.  Buyer, on the one hand, and Seller, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Seller, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE II

## PURCHASE AND SALE

Section 2.1     Purchase and Sale of the Acquired Assets.  On the terms and subject to the conditions set forth in this Agreement, on the Closing Date, in consideration of payment of the Purchase Price and assumption of the Assumed Liabilities by Buyer, Seller shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, free and clear of any Encumbrances (other than Permitted Encumbrances), and Buyer shall purchase, assume and accept from Seller, the assets listed on Schedule 2.1 (collectively, the "Acquired Assets").

Section 2.2     Excluded Assets.  Notwithstanding anything herein to the contrary, the Buyer shall not acquire any right, title or interest in or to any assets, properties, rights, interests, or claims of any kind or description of Seller or its Affiliates other than the Acquired Assets, provided, however, that the Buyer shall have the right to assert any claim or cause of action necessary to enforce Buyer's title, claim or interests in and to any of the Acquired Assets, (collectively, the "Excluded Assets").  For the avoidance of doubt, Excluded Assets shall include Avoidance Actions and all Claims that Trustee may have on behalf of the Estate against any former officers or directors of the Debtor.

Section 2.3     Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, contemporaneously with the sale, assignment and transfer of the Acquired Assets to Buyer, Buyer shall assume and agree to pay, perform and discharge, as and when due (in accordance with the respective terms and subject to the respective conditions thereof) only those Liabilities arising from or relating to the ownership of the Acquired Assets or the use thereof by Buyer from and after the Closing, all Transfer Taxes (as described in Section 7.1(a)), and those Taxes pro-rated to Buyer pursuant to Section 7.1(c) (collectively, the "Assumed Liabilities"), and no other Liabilities whatsoever of Seller.

Section 2.4     Excluded Liabilities.  Buyer shall not assume or be obliged to pay, perform or otherwise discharge, and Seller shall be solely and exclusively liable with respect to, any Liability of Seller that is not an Assumed Liability (such Liabilities, collectively, the "Excluded Liabilities").

Section 2.5     Further Assurances.  Following the Closing, Seller, on the one hand, and Buyer, on the other hand, shall use their respective commercially reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things reasonably necessary under applicable Law, and execute and deliver such instruments and documents and to take such other actions, as may be required to consummate the transactions contemplated by this Agreement at or after the Closing; provided, that nothing in this Section 2.5 shall prohibit Seller from closing the Bankruptcy Case, upon which Seller will have no responsibility under this Section 2.5.  In furtherance and not in limitation of the foregoing, in the event that any of the Acquired Assets shall not have been conveyed at Closing, Seller shall use commercially reasonable efforts to convey such Acquired Assets to Buyer as promptly as practicable after the Closing, provided that Buyer shall be responsible for the preparation of any additional documents required to evidence the transactions contemplated by this Agreement.

6

## ARTICLE III

## PURCHASE PRICE; CLOSING

Section 3.1    Purchase Price.    In consideration for the purchase, sale, assignment and conveyance of the Acquired Assets, Buyer shall pay to Seller cash in the amount of the Cash Consideration (the "Purchase Price") and assume the Assumed Liabilities. In addition, the Purchase Price shall include the voluntary subordination of any and all claims, except claims for wages or severance, that Steven Gordon and Chris Thorn have or may have against the Trustee or the Debtor's estate, to all other allowed claims of creditors (but not equity).

Section 3.2    Deposit.    Buyer has delivered to Trustee the Deposit in immediately available funds. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Buyer. The Deposit shall be retained by Trustee at the Closing (and deducted from the Purchase Price due and payable at the Closing), or if this Agreement is terminated, treated in the manner set forth in Section 10.2.

Section 3.3    Closing Date Payment.    None.

Section 3.4    Closing Date.    On the terms and subject to the conditions set forth in this Agreement, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place by electronic exchange of documents on a date no later than the first Business Day following the date on which the conditions set forth in Article VIII and Article IX have been satisfied or (if permissible) waived (other than the conditions that by their nature are to be satisfied by actions taken at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or at such other place or time as Buyer and Seller may mutually agree upon in writing. The date and time at which the Closing actually occurs is referred to herein as the "Closing Date."

Section 3.5    Buyer's Deliveries to Seller.    At the Closing, Buyer shall deliver to Seller each of the following:

(a)    each other Transaction Document not previously executed to which Buyer is a party, duly executed by Buyer; and

(b)    such assignments and other good and sufficient instruments of assumption and transfer, each in form reasonably satisfactory to Seller, as Seller may reasonably request to transfer and assign the Acquired Assets and Assumed Liabilities to Buyer.

Section 3.6    Seller's Deliveries to Buyer.    At the Closing, Seller shall deliver to Buyer each of the following:

(a)    each other Transaction Document to which Seller is a party, duly executed by Seller;

(b)    confirmation that the Bankruptcy Court shall have entered the Sale Order, which shall have become final and non-appealable, and no order staying, reversing, modifying, or materially amending the Sale Order shall be in effect on the applicable Closing Date;

(c)    such bills of sale, deeds, endorsements, assignments, other good and sufficient instruments, each in form reasonably satisfactory to Buyer, which are necessary to vest in Buyer all the

right, title and interest of Seller in, to or under any or all of the Acquired Assets free and clear of Encumbrances other than Permitted Encumbrances; and

        (d)        a duly completed Form W-9 executed by Seller.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

      Except as set forth in the Schedules, Seller hereby represents and warrants to Buyer that the following statements contained in this <u>Article IV</u> are true and correct as of the date hereof and as of the Closing Date:

      Section 4.1    <u>Authority; Validity; Consents</u>. Seller has, subject to requisite Bankruptcy Court approval, the requisite corporate power and authority necessary to enter into and perform Seller's obligations under this Agreement and the other Transaction Documents to which Seller is a party and to consummate the transactions contemplated hereby and thereby. This Agreement has been duly and validly executed and delivered by Seller and each other Transaction Document required to be executed and delivered by Seller at the Closing will be duly and validly executed and delivered by Seller at the Closing. Subject to requisite Bankruptcy Court approval, this Agreement and the other Transaction Documents constitute, with respect to Seller, the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to, and after giving effect to, requisite Bankruptcy Court approval (including, without limitation, the Sale Order), as applicable, and except (a) for entry of the Sale Order, and (b) for notices, filings and consents required in connection with the Bankruptcy Case, Seller is not required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a party or the consummation or performance of any of the transactions contemplated hereby and thereby.

      Section 4.2    <u>Transfer of Acquired Assets</u>. Immediately prior to Closing, Seller will have and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by <u>Section 3.6</u>, and subject to the terms of the Sale Order, Seller will thereby transfer to Buyer all of the Acquired Assets free and clear of all Encumbrances, except (i) as set forth on <u>Schedule 4.2</u> and (ii) for Permitted Encumbrances.

      Section 4.3    <u>Legal Proceedings</u>. As of the date hereof, except for the Bankruptcy Case and as set forth on <u>Schedule 4.3</u>, there is no Proceeding or Order pending or, threatened in writing against Seller that (a) seeks to restrain or prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or (b) would have a material effect on the Acquired Assets.

      Section 4.4    <u>Brokers or Finders</u>. Except as set forth on <u>Schedule 4.4</u> hereof, Seller has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment owed in connection with this Agreement, the other Transaction Documents to which it is a party or the transactions contemplated hereby or thereby, in all cases for which Buyer is or will become liable following the Closing.

      Section 4.5    <u>No Other Representations or Warranties; No Survival</u>. Buyer acknowledges, on behalf of itself and its Affiliates, that, except for the representations and warranties contained in this <u>Article IV</u>, none of Seller, Seller's Affiliates or any other Person on behalf of Seller or Seller's Affiliates makes any express or implied representation or warranty with respect to Seller, the Acquired Assets, or with

respect to any information provided by or on behalf of Seller or its Affiliates to Buyer. Without limiting the generality of the foregoing, and except as otherwise provided herein, Seller expressly disclaims any representations or warranties (whether written or oral) regarding accuracy, sufficiency, fitness for a particular purpose, merchantability, and non-infringement of third-party rights, and it is understood that, except as expressly stated in this Agreement, the Acquired Assets are being transferred on a "where is" and, as to condition, "as is" basis. All representations and warranties of Seller will expire upon the earlier of the Closing Date or the termination of this Agreement. Nothing in this Section 4.5, however, shall relieve Seller from any Liability on account of actual and knowing fraud.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller that the following statements contained in this Article V are true and correct as of the date hereof and as of the Closing Date:

Section 5.1    Organization and Good Standing. Buyer is a Delaware, duly organized, validly existing and in good standing under the laws of the jurisdiction Buyer's organization. Buyer has the requisite power and authority to own or lease and to operate and use Buyer's properties and to carry on Buyer's business as now conducted.

Section 5.2    Authority; Validity; Consents. Buyer has the requisite power and authority necessary to enter into and perform Buyer's obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated herein have been duly and validly authorized by all requisite corporate actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a party will be duly and validly executed and delivered by Buyer at the Closing. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to requisite Bankruptcy Court approval, as applicable, Buyer is not and will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a party or the consummation or performance of any of the transactions contemplated hereby or thereby.

Section 5.3    No Conflict. The execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) any agreement, indenture, or other instrument to which it is bound, (b) the certificate of incorporation of Buyer, (c) any Order or (d) any Law.

Section 5.4    Availability of Funds; Solvency. Buyer will have at the Closing sufficient cash in immediately available funds to pay the Purchase Price and any other costs, fees and expenses required to be paid by it under this Agreement and the other Transaction Documents. As of the Closing and immediately after consummating the transactions contemplated by this Agreement and the other transactions contemplated by the Transaction Documents, Buyer will not, assuming that the representations and warranties made by Seller in Article IV of this Agreement are accurate in all material respects, (i) be insolvent (either because Buyer's financial condition is such that the sum of Buyer's debts is greater than the fair value of Buyer's assets or because the present fair value of Buyer's assets will be less than the

amount required to pay Buyer's probable Liability on Buyer's debts as they become absolute and matured), (ii) have unreasonably small capital with which to engage in Buyer's business, or (iii) have incurred or plan to incur debts beyond Buyer's ability to repay such debts as they become absolute and matured.

Section 5.5    Legal Proceedings.  There are no Proceedings pending or, to the knowledge of Buyer, threatened, that would affect in any material respect Buyer's ability to perform Buyer's obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

Section 5.6    Brokers or Finders.  Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Seller is or will become liable, and Buyer shall hold harmless and indemnify Seller from any claims with respect to any such fees or commissions.

Section 5.7    Condition of Acquired Assets; Buyer's Investigation; Representations. Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly made by Seller in Article IV (subject to the disclosures set forth on the Schedules), and Buyer acknowledges and agrees that, except for the representations and warranties contained in Article IV, the Acquired Assets are being transferred on a "where is" and, as to condition, "as is" basis.  Buyer acknowledges that it has conducted to Buyer's satisfaction Buyer's own independent investigation of Acquired Assets and Assumed Liabilities and, in making the determination to proceed with the transactions contemplated by this Agreement, Buyer has relied on the results of Buyer's own independent investigation. In connection with Buyer's investigation, Buyer has received or may receive from Seller certain projections, forward-looking statements and other forecasts and certain business plan information.  Buyer acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making Buyer's own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to Buyer (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that Buyer shall have no claim against anyone (including, for the avoidance of doubt, Seller or any of its Affiliates or Representatives) with respect thereto.  Accordingly, Buyer acknowledges that Seller makes no representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).  Nothing in this Section 5.7, however, shall relieve Seller from any Liability on account of actual and knowing fraud.

**ARTICLE VI**

**ACTIONS PRIOR TO THE CLOSING DATE**

Section 6.1    Operations Prior to the Closing Date.  Seller covenants and agrees that, except (i) as expressly contemplated by this Agreement, (ii) with the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed, (iii) as required by the Bankruptcy Court or (iv) as otherwise required by Law, after the Effective Date and prior to the Closing Date (or the earlier termination of this Agreement):

(a)    Seller shall use commercially reasonable efforts, taking into account Seller's status as Trustee in the Bankruptcy Case, to maintain and preserve the Acquired Assets in their present condition in all material respects and, without limiting the generality of the foregoing,

(b)     Seller shall not:

(i)     sell, lease (as lessor), transfer or otherwise dispose of, or mortgage or pledge, or voluntarily impose or suffer to be imposed any Encumbrance (other than Permitted Encumbrances) on, any Acquired Asset; or

(ii)     cancel or compromise any material Claim or waive or release any material right, in each case, that is a Claim or right related to an Acquired Asset;

(iii)     enter into any agreement that limits or restricts the conduct of the Acquired Assets in any location or with any Person; or

(iv)     enter into any agreement or commitment to take any action prohibited by this Section 6.1.

Section 6.2     Bankruptcy Court Filings and Approval.

(a)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (whether through cash, assumed liabilities or credit bid) in respect of a sale or other disposition of the Acquired Assets (collectively, "Competing Bids"). From the date hereof (and any prior time) and until the transactions contemplated hereby are consummated, Seller is permitted to and to cause its Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with any Alternative Transaction. In addition, Seller shall have the authority to respond to any inquiries or offers with respect to an Alternative Transaction and perform any and all other acts related thereto to the extent any such act is not in violation of the Bankruptcy Code. In the event of any Competing Bid, inquiry or offer, Seller will promptly notice Buyer and provide Buyer with an opportunity to object to the Competing Bid or provide a higher or better Competing Bid.

(b)     Seller shall use Seller's commercially reasonable efforts to obtain entry of the Sale Order and such other relief from the Bankruptcy Court as may be necessary or appropriate in connection with this Agreement and the consummation of the transactions contemplated by this Agreement. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and, consistent with Section 2.5, a finding by the Bankruptcy Court of adequate assurance of future performance by Buyer.

(c)     Seller and Buyer acknowledge that this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval. Seller and Buyer acknowledge that to obtain such approval, Seller must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Acquired Assets and Buyer hereby agrees to provide reasonable assurances thereof necessary in order to obtain the foregoing approvals.

(d)     Seller shall give all notices required to be given by applicable Law, to all Persons entitled thereto, of all motions (including the motions seeking entry of the Sale Order), orders, hearings and other proceedings relating to this Agreement and the transactions contemplated hereby and thereby and such additional notice as ordered by the Bankruptcy Court or as Buyer may reasonably request.

(e)     The Buyer acknowledges that the Seller must serve the Sale Notice at least twenty-one (21) days prior to any Auction. The Seller will serve the Sale Notice as soon as reasonably practicable after entry into this Agreement.

(f)     After entry of the Sale Order, Seller shall not take any action that is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

(g)     Break-Up Fee.  In the event that an Alternative Transaction is consummated and Seller shall not be entitled to any expense reimbursement, break-up fee, or other payment from the Trustee or bankruptcy estate.

## ARTICLE VII

## ADDITIONAL AGREEMENTS

Section 7.1     Taxes.

(a)     Any sales, use, transfer, documentary, stamp, registration, recording, value added or similar Taxes and fees (including any penalties and interest) payable in connection with the sale or transfer of the Acquired Assets ("Transfer Taxes"), along with any expenses arising in connection with preparation and filing of Tax Returns with respect to the Transfer Taxes, shall be borne solely by Buyer. Accordingly, if Seller is required by Law to pay any such Transfer Taxes, Buyer shall promptly reimburse such Seller for the amount of such Transfer Taxes actually paid by Seller. Each Tax Return with respect to Transfer Taxes will be prepared and filed by the party that customarily has primary responsibility for filing such Tax Return pursuant to applicable Law. Seller and Buyer shall use reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes to the extent allowed under applicable Law, and shall each timely sign and deliver (or cause to be timely signed and delivered) such certificates or forms as may be necessary or appropriate.

(b)     Notwithstanding any other provisions in this Agreement, Buyer and Seller hereby waive compliance with all "bulk sales," "bulk transfer" and similar laws that may be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

(c)     Any personal property or similar Taxes, if any, applicable to the Acquired Assets for a Straddle Period shall be apportioned between the Buyer on the one hand and Seller on the other hand based on the number of days of the Straddle Period included in the Pre-Closing Tax Period and the number of days of the Straddle Period in the Post-Closing Tax Period. Seller shall be liable for the proportionate amount of such Taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Taxes that is attributable to the Post-Closing Tax Period. Seller shall pay to Buyer an amount equal to any such Taxes payable by Buyer which are attributable to the Pre-Closing Tax Period, and the Buyer shall pay to Seller an amount equal to any such Taxes which have been paid by Seller, which are not attributable to the Pre-Closing Tax Period. Such payments shall be made on the Closing Date, or if later, on the date such Taxes are due (or thereafter, promptly after request by Buyer or Seller if such Taxes are not identified by Buyer or Seller on or prior to the Closing Date).

Section 7.2     Information; Confidentiality.

(a)     The terms of any confidentiality agreement to which Buyer (or an Affiliate of Buyer) is party in respect of Seller (or any Affiliate of Seller) shall continue in full force and effect until the Closing, at which time Buyer's obligations under any such confidentiality agreement shall terminate only insofar as they pertain to the Acquired Assets, and shall otherwise remain in full force and effect in accordance with the terms thereof.

(b)     From the date hereof until the Closing (or the earlier termination of this Agreement), Seller will provide Buyer and its Representatives with information concerning the Acquired Assets and/or the Assumed Liabilities, as Buyer or any of its Representatives may reasonably request; provided, that in no event shall Seller be required to create any information in writing, electronic format or otherwise (including, but not limited to reports, records or files) concerning the Acquired Assets and/or the Assumed Liabilities that did not exist prior to such request of Buyer or any of its Representatives. Notwithstanding anything to the contrary in this Agreement, Seller shall not be required to disclose any information to Buyer if such disclosure would (x) jeopardize any attorney-client or other privilege or (y) conflict with or violate any applicable Law or fiduciary duty.

## ARTICLE VIII

## CONDITIONS PRECEDENT TO THE OBLIGATION OF BUYER TO CLOSE

Buyer's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver by Buyer (to the extent waivable), at or prior to the Closing, of each of the following conditions:

Section 8.1     Accuracy of Representations.   The representations and warranties of Seller contained in Article IV shall be true and correct as of the date hereof and as of the Closing Date as though made on and as of the Closing Date (except that those representations and warranties addressing matters as of a particular date which shall be true and correct as of such date); provided, however, that, other than in respect of Section 4.1, Section 4.2 and Section 4.4, the condition in this Section 8.1 shall be deemed to be satisfied so long as any failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein), individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect.  At the Closing, Buyer shall receive a certificate of Seller, signed by a duly authorized officer of Seller, to that effect.

Section 8.2     No Order.  No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement (a "Closing Legal Impediment"); provided, however, that prior to asserting this condition Buyer shall have taken all actions required by Section 6.2 to prevent the occurrence or entry of any such Closing Legal Impediment and to remove or appeal as promptly as possible any such Closing Legal Impediment.

Section 8.3     Seller's Deliveries.  Each of the deliveries required to be made to Buyer pursuant to Section 3.6 shall have been so delivered.

Section 8.4     Bankruptcy Court Approvals.  (a) The Bankruptcy Court shall have entered the Sale Order and (b) the Sale Order shall not be subject to a stay pending appeal.

## ARTICLE IX

## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE

Seller's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver by Seller (to the extent waivable), at or prior to the Closing, of each of the following conditions:

Section 9.1 <u>Accuracy of Representations</u>. The representations and warranties of Buyer contained in <u>Article V</u> shall be true and correct (except for *de minimis* inaccuracies) as of the date hereof and as of the Closing Date as though made on and as of the Closing Date (except that those representations and warranties addressing matters only as of a particular date which shall be true and correct as of such date); <u>provided</u>, <u>however</u>, that, other than in respect of <u>Section 5.1</u>, <u>Section 5.2</u> and <u>Section 5.6</u>, the condition in this <u>Section 9.1</u> shall be deemed to be satisfied so long as any failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality" or "material adverse effect" set forth therein), individually or in the aggregate, has not had and would not reasonably be expected to prevent or materially impair the ability of Buyer to consummate the transactions contemplated by this Agreement. At the Closing, Seller shall receive a certificate of Buyer, signed by a duly authorized officer of Buyer, acting solely in such capacity, to that effect.

Section 9.2 <u>No Order</u>. No Closing Legal Impediment shall be in effect, <u>provided</u>, <u>however</u>, that prior to asserting this condition Seller shall have taken all actions required by <u>Section 6.2</u> to prevent the occurrence or entry of any such Closing Legal Impediment and to remove or appeal as promptly as possible any such Closing Legal Impediment.

Section 9.3 <u>Buyer's Deliveries</u>. Each of the deliveries required to be made to Seller pursuant to <u>Section 3.5</u> shall have been so delivered.

Section 9.4 <u>Bankruptcy Court Approvals</u>. (a) The Bankruptcy Court shall have entered the Sale Order and (b) the Sale Order shall not be subject to a stay pending appeal.

## ARTICLE X

## TERMINATION

Section 10.1 <u>Termination Events</u>. Notwithstanding anything contained in this Agreement to the contrary (other than as provided in the last sentence of this <u>Section 10.1</u>), this Agreement may be terminated at any time prior to the Closing Date:

        (a)    by mutual written consent of Seller and Buyer; or

        (b)    by either Seller or Buyer:

        (i)    if the Bankruptcy Court does not approve this Agreement for any reason or if a Governmental Authority issues a final, non-appealable ruling or Order permanently prohibiting the transactions contemplated hereby, <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 10.1(b)(i)</u> shall not be available to any Party whose breach of any of its representations, warranties, covenants or agreements contained herein results in such failure to approve, such ruling or Order;

        (ii)    if the Sale Order is vacated;

        (iii)    if Seller enters into a definitive agreement with respect to an Alternative Transaction;

        (iv)    Seller consummates an Alternative Transaction; or

        (c)    by Buyer:

(i)     in the event of any breach by Seller of any of Seller's agreements, covenants, representations or warranties contained herein that would result in the failure of a condition set forth in <u>Article VIII</u> to be satisfied, and the failure of Seller to cure such breach by the date that is 30 days after receipt of the Buyer Termination Notice; <u>provided, however,</u> that (1) Buyer is not in breach of any of Buyer's representations, warranties, covenants or agreements contained herein in a manner that would result in the failure of a condition set forth in <u>Article IX</u> to be satisfied, (2) Buyer notifies Seller in writing (the "<u>Buyer Termination Notice</u>") of Buyer's intention to exercise Buyer's rights under this <u>Section 10.1(c)(i)</u> as a result of the breach, and (3) Buyer specifies in the Buyer Termination Notice the representation, warranty, covenant or agreement contained herein of which Seller is allegedly in breach;

(ii)     if the Bankruptcy Case is dismissed and such dismissal does not expressly contemplate the transactions provided for in this Agreement; or

(iii)     if any conditions to the obligations of Buyer set forth in <u>Article VIII</u> shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement; or

(d)     by Seller:

(i)     except as provided in <u>Section 10.1(d)(iii)</u>, in the event of any breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein that would result in the failure of a condition set forth in <u>Article IX</u> to be satisfied, and the failure of Buyer to cure such breach by the earlier of (A) the Outside Date and (B) the date that is 15 days after receipt of the Seller Termination Notice; <u>provided, however,</u> that Seller (1) is not itself in material breach of any of Seller's representations, warranties, covenants or agreements contained herein, notify Buyer in writing (the "<u>Seller Termination Notice</u>") of Seller's intention to exercise Seller's rights under this <u>Section 10.1(d)(i)</u> as a result of the breach, and specify in the Seller Termination Notice the representation, warranty, covenant or agreement contained herein of which Buyer is allegedly in breach;

(ii)     if Seller consummates a sale, transfer or other disposition of any portion of the Acquired Assets in a transaction or series of transactions with one or more Persons other than Buyer; or

(iii)     if the Sale Order with respect to the transactions contemplated by this Agreement has been entered and is not subject to any stay on enforcement and (A) Seller has provided Buyer with written notice that Seller is prepared to consummate the transactions contemplated by this Agreement, (B) the conditions to Closing in <u>Article VIII</u> have been satisfied (or waived by Buyer), other than those conditions that by their nature can only be satisfied at Closing, and (C) the Closing Date does not occur within one Business Day of Seller providing Buyer with such notice.

Section 10.2     <u>Effect of Termination and Liquidated Damages.</u>  If this Agreement is terminated pursuant to <u>Section 10.1(d)(i)</u> or <u>Section 10.1(d)(iii)</u> or by Buyer pursuant to <u>Section 10.1(b)(ii)</u>, the Deposit (including, for the avoidance of doubt, all interests and other earnings accrued and earned thereon) shall be retained by Seller as damages specifically, and the retention thereof shall constitute the sole and exclusive remedy of Seller in the event of such a termination hereunder. If this Agreement is terminated pursuant to any other provision of <u>Article X</u> (i.e., except as described in the immediately preceding sentence), Seller shall promptly return the Deposit (including, for the avoidance of doubt, all interests and other earnings accrued and earned thereon) to Buyer by check from the Debtor's estate and the return thereof shall constitute the sole and exclusive remedy of Buyer in the event of such a termination hereunder. Nothing in this <u>Section 10.2</u>, however, shall relieve Seller or Buyer from any Liability on account of fraud or be deemed to impair the right of any Party to compel specific performance by another Party of its obligations under

this Agreement. The provisions of this <u>Section 10.2</u> shall survive any termination of this Agreement pursuant to <u>Article X</u>.

**ARTICLE XI**

**GENERAL PROVISIONS**

Section 11.1 <u>Notices</u>. Any notice, consent or other communication required or permitted under this Agreement shall be in writing and shall be delivered (a) in person, (b) by a nationally recognized courier for overnight delivery service, or (c) by email or other electronic means to the persons indicated below. A notice or communication shall be deemed to have been effectively given (i) if in person, upon personal delivery to the Party to whom the notice is directed, (ii) if by nationally recognized courier, one Business Day after delivery to such courier, and (iii) if by email or other electronic means, when sent unless the sender receives a "bounce back" or similar indication that the e-mail was not delivered to the recipient. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt. Any such notice, election, demand, request or response shall be addressed as follows:

    (a)    If to Seller, then to:

        Steve Gordon
        300 East 33rd Street
        New York, New York 10016
        E-mail: <u>steve@sngordon.com</u>
        (212) 308-6000

        With a copy (which shall not constitute notice) to:

    (b)    If to Buyer, then to:

        Law Office of Gregory Messer, PLLC
        26 Court Street, Suite 2400
        Brooklyn, New York 11242
        Attention: Gregory Messer
        E-mail: gremesser@aol.com

        with a copy (which shall not constitute notice) to:

        Klestadt Winters Jureller Southard & Stevens, LLP
        200 West 41st Street, 17th Floor
        New York, New York 10036
        Attention: Fred Stevens and Lauren C. Kiss
        E-mail: <u>fstevens@klestadt.com</u> and <u>lkiss@klestadt.com</u>

Section 11.2 <u>Amendment; Waiver</u>. No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the Party against whom enforcement of the amendment, modification, discharge or waiver is sought and

such amendment, modification, discharge or waiver is delivered substantially contemporaneously to each other Party. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time. Neither the waiver by any of the Parties of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the Parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder. No course of dealing between or among the Parties shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights to payment of any Party under or by reason of this Agreement.

Section 11.3    Entire Agreement.    This Agreement (including the Schedules) and the other Transaction Documents contain all of the terms, conditions and representations and warranties agreed to by the Parties relating to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations, correspondence, undertakings and communications of the Parties or their representatives, oral or written, respecting such subject matter. The representations, warranties, covenants and agreements contained in this Agreement (including the Schedules) and the other Transaction Documents are intended, among other things, to allocate the economic cost and the risks inherent in the transactions contemplated hereby and thereby, including risks associated with matters as to which the party making such representations and warranties has no knowledge or only incomplete knowledge, and such representations and warranties may be qualified by disclosures contained in the Schedules. Consequently, Persons other than the Parties may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

Section 11.4    No Presumption as to Drafting.    Each of the Parties acknowledges that it has been represented by legal counsel in connection with this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement or the Transaction Documents against the drafting party has no application and is expressly waived.

Section 11.5    Assignment.    The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns. This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Party (which consent may be granted or withheld in the sole discretion of such other Party); provided, however, that Buyer shall be permitted, upon prior notice to Seller, to assign all or part of Buyer's rights or obligations hereunder to an Affiliate, but no such assignment shall relieve Buyer of Buyer's obligations under this Agreement.

Section 11.6    Severability.    The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

Section 11.7    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and all claims or causes of action (whether in contract, tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement

(including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) shall be governed by, and construed in accordance with, the laws of the State of New York applicable to Contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto.

(b)     Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; provided, however, that, if the Bankruptcy Case is closed, all Proceedings arising out of or relating to this Agreement shall be heard and determined in the United States District Court for the Southern District of New York, and the Parties hereby (a) irrevocably and unconditionally submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York; (b) agree that all claims with respect to any such Proceeding shall be heard and determined in such courts and agrees not to commence any Proceeding relating to this Agreement or the transactions contemplated hereby (whether based on contract, tort or other theory) except in such courts; (c) irrevocably and unconditionally waive any objection to the laying of venue of any Proceeding arising out of this Agreement or the transactions contemplated hereby and irrevocably and unconditionally waives the defense of an inconvenient forum; and (d) agree that a final judgment in any such Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  The Parties agree that any violation of this Section 11.7(b) shall constitute a material breach of this Agreement and shall constitute irreparable harm.

(c)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS Section 11.7.

Section 11.8     Counterparts.  This Agreement may be executed in any number of counterparts (including via facsimile or other electronic transmission in portable document format (pdf)) with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement. This Agreement shall become effective when, and only when, each Party shall have received a counterpart hereof signed by the other Party.  Delivery of an executed counterpart hereof by means of facsimile or electronic transmission in portable document format (pdf) shall have the same effect as delivery of a physically executed counterpart in person.

Section 11.9     Parties in Interest; No Third Party Beneficiaries.  Nothing in this Agreement shall confer any rights, benefits, remedies, obligations, liabilities or claims hereunder upon any Person not a Party or a permitted assignee of a Party.

Section 11.10   Non-Recourse. All claims, obligations, liabilities or causes of action (whether in contract or in tort, in law or in equity or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with or relate in any manner to this Agreement, the negotiation, execution or performance of this Agreement (including any representation or warranty made in connection with or as an inducement to this Agreement) or the transactions contemplated hereby may be made only against (and are those solely of) the Persons that are expressly identified as Parties to this Agreement. No other Person, including any of their Affiliates, directors, officers, employees, incorporators, members, partners, managers, stockholders, agents, attorneys, or representatives of, or any financial advisors or lenders to, any of the foregoing shall have any liabilities (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations or liabilities arising under, out of, in connection with, or related in any manner to, this Agreement or based on, in respect of, or by reason of, this Agreement or its negotiation, execution, performance or breach.

Section 11.11   Schedules; Materiality. The inclusion of any matter in any Schedule shall be deemed to be an inclusion for all purposes of this Agreement, to the extent that such disclosure is sufficient to identify the Section to which such disclosure is responsive, but inclusion therein shall not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement. The disclosure of any particular fact or item in any Schedule shall not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

Section 11.12   Specific Performance. The Parties acknowledge and agree that irreparable injury, for which monetary damages, even if available, would not be an adequate remedy, will occur in the event that any of the provisions of this Agreement are not performed in accordance with the specific terms hereof or are otherwise breached, and a Party shall be entitled, in addition to any other remedies that may be available, to obtain (without the posting of any bond) specific performance of the terms of this Agreement. For the avoidance of doubt, Buyer has no right to initiate any Proceeding against Seller or otherwise compel specific performance of this Agreement so long as Seller has terminated this Agreement in accordance with the terms hereof.

Section 11.13   No Survival. None of the representations and warranties or covenants which require performance prior to the Closing ("Pre-Closing Covenants") contained in this Agreement, any Transaction Document or in any certificate or schedule delivered pursuant to hereto or thereto shall survive the Closing. In furtherance, not limitation, of the foregoing, the Parties, intended to contractually shorten any otherwise applicable statute of limitations, hereby agree that: (a) the representations and warranties herein are intended solely to facilitate disclosure and to give effect to the closing conditions set forth in Articles VIII and IX, (b) the Pre-Closing Covenants are intended solely to give effect to the closing conditions set forth in Articles VIII and IX and (c) no claim of any kind based on the failure of any representation or warranty to have been true and correct, or based on the failure of any Pre-Closing Covenant to have been performed or complied with, may be brought at any time after the Closing. All covenants and agreements contained herein that by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall survive the Closing in accordance with their terms.

Section 11.14   Publicity. Neither Party nor any of their respective representatives may make any press release or other public disclosure regarding the existence of this Agreement or the other Transaction Documents, its or their contents, or the transactions contemplated by this Agreement or the other Transaction Documents without the written consent of the other Party, in any case, as to the form, content, and timing and manner of distribution or publication of such press release or other public disclosure (which consent may not be unreasonably withheld, conditioned, or delayed); provided that following the Closing, Buyer shall be permitted to make one or more public statements that it has acquired the Acquired Assets and the Assumed Liabilities. Each Party shall hold confidential the terms and provisions of this Agreement

and the other Transaction Documents and the terms of the transactions contemplated by this Agreement and the other Transaction Documents. Notwithstanding the foregoing, nothing in this Section 11.14 will prevent either Party or its representatives from making any press release or other disclosure required by Law (including in connection with the Bankruptcy Case or Sale Motion) or the rules of any stock exchange, in which case the Party required to make such press release or other disclosure shall use commercially reasonable efforts to allow the other Party reasonable time to review and comment on such release or disclosure in advance of its issuance.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

EXHIBIT A TO SALE MOTION - ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the Effective Date.

**BUYER**:

L4 Bio LLC

By:_____
Name: Steve Gordon
Title:  President

**SELLER**:

Gregory M. Messer, solely in his capacity as Chapter 7 Trustee of the Estate of Equilibre Biopharmaceuticals Corp.

By:_____
Name:
Title:

Schedule 1.1(b)

Permitted Encumbrances

None known.

Schedule 2.1

Acquired Assets

- All of Seller's right, title and interest in, to and under all of the assets, properties, rights and interests used in, held for use in connection with, or otherwise related to any drug development, biotechnology or biopharmaceuticals (a "Product Candidate");
- All data, computers, servers, physical, electronic and other storage and data devices, documents, Office 365 data and Exchange accounts, domain names, equipment, tools, supplies, and other non-tangible and tangible personal property used in, held for use in connection with, or otherwise related to any Product Candidate, provided, however, that if any such computers, servers, or documents contain any information regarding the financial affairs of the Debtor, the Buyer must provide an authentic copy of such device, electronic file, or document to the Trustee prior to taking possession of same;
- All of the Seller's interest in Equilibre BioPharmaceuticals B.V.; and
- All biologic and human samples, pre-clinical and clinical samples, and drug materials, substance and product, related to any Product Candidate.

Schedule 4.2

Exceptions to Ownership of Acquired Assets

None

## Schedule 4.3

## Proceedings

None

Schedule 4.4

Brokers and Finders

None